### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

KATHERINE LYNN GELBRICH,

        Plaintiff,

v.                                       ACTION NO. 4:13cv54

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security
Administration,

        Defendant.

### UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

    Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

    This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated July 12, 2013. This Court recommends that the decision of the Commissioner be AFFIRMED.

### I.  PROCEDURAL BACKGROUND

    The plaintiff, Katherine Lynn Gelbrich, protectively filed an application for DIB on August 24, 2009, alleging she had been disabled since August 11, 2009. R. 145-46.[1]  Her

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

application was denied, both initially on June 4, 2010, and upon reconsideration on December 17, 2010. R. 94-102, 104-113. At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on November 10, 2011. R. 57-92. Plaintiff, who was represented by counsel, and an impartial vocational expert testified.  R. 57-92. On January 19, 2012, the ALJ issued a decision denying Plaintiff's claim for DIB. R. 21-29. The Appeals Counsel denied a request to review that decision on February 22, 2013, making the ALJ's decision the Commissioner's final decision.  R. 1-4.

Having exhausted all administrative remedies, Plaintiff filed a complaint with this Court on May 2, 2013, which Defendant answered July 9, 2013. ECF Nos. 4 and 6. The parties have filed cross motions for summary judgment. ECF Nos. 11 and 14. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Plaintiff, who was born in 1960, was forty-eight years old on the alleged disability onset date and fifty years old at the time of her hearing before the ALJ. R. 28, 62, 145. Plaintiff has past relevant work experience as a nurse. R. 66-67. Plaintiff had three surgeries on her left shoulder, two left rotator cuff repairs and a left bicep tendon repair. R. 183, 432.  She also had two rotator cuff repair surgeries on her right shoulder. R. 183, 388. She testified to having fibromyalgia causing her pain all over. R. 74.

### A.    Medical Records

In 2005, Plaintiff injured her left shoulder while boogie boarding. R. 232-39.  X-rays revealed no significant abnormality. R. 239. An MRI, conducted October 24, 2005, revealed a fracture of the humeral head and a partial thickness tear of the undersurface of the supraspinatus.

2

R. 583. Subsequently, Plaintiff had three rotator cuff surgeries performed on her left shoulder. R. 432.

On January 29, 2009, Plaintiff was treated by Mark S. Topolski, M.D., at the Naval Medical Center in Portsmouth. R. 432-33.  Plaintiff reported that following her third shoulder surgery, she recovered excellent motion and fairly good strength of the left shoulder. R. 432. However, she continued having pain, which she rated as a six to eight out of ten, on a daily basis. R. 432. She also reported the same symptoms in her right shoulder, which had never had surgery. R. 432. Examination of her right shoulder showed range of motion in external rotation to 45 degrees and elevation to 175 degrees. R. 433. She had a mildly positive Hawkins, Neer's, and Yergason's tests, a grossly positive empty beer can test, and negative labral shear and Speed's tests. R. 433.  X-rays of the right shoulder showed some very mild degenerative changes. R. 433. Plaintiff received subacromial injections in both shoulders, received a prescription for Celebrex, and was referred for an MRI. R. 430, 433.

On April 10, 2009, Dr. Topolski reviewed Plaintiff's MRI, which revealed "an undersurface tear of the distal supraspinatus tendon[,] which extends nearly for the entire breadth of the tendon." R. 430.  Dr. Topolski assessed Plaintiff with right shoulder AC arthritis, right shoulder impingement, and right shoulder partial supraspinatus tear. R. 430. Plaintiff was referred for two to three months of physical therapy in an attempt to avoid rotator cuff repair to the right shoulder. R. 430.

On July 9, 2009, Dr. Topolski found conservative management had failed. R. 426. Plaintiff reported difficulty lifting anything in the OR, where she was working as a nurse, and difficulty in participating in patient care. R. 426.  Dr. Topolski prescribed Vicodin to assist Plaintiff with sleeping until surgery could be performed on her right shoulder. R. 426-27.

3

Plaintiff continued working as a nurse until August 11, 2009, her alleged disability onset date. R. 66, 69.

On August 25, 2009, Plaintiff returned to Dr. Topolski following arthroscopic rotator cuff repair of her right shoulder. R. 418-19.  Plaintiff was wearing a brace and doing physical therapy, which was going well. R. 418. Her pain was well controlled with narcotic medication. R. 419. Plaintiff was prescribed Dilaudid and Vicodin. R. 419.

On September 30, 2009, seven weeks after her surgery, Dr. Topolski was concerned Plaintiff was starting to develop possible frozen shoulder. R. 412.  He instructed Plaintiff to increase her range of motion activities with physical therapy. R. 412.

On December 8, 2009, Plaintiff reported to Dr. Topolski that while her range of motion was markedly improved, she had deep aching pain, which was as bad as it had been prior to surgery. R. 401.  Dr. Topolski reviewed an MRI taken in November 2009, and found multiple high grade partials and at least one full thickness tear, subacromial deltoid bursitis, and a small distal clavicle fracture. R. 401.  Dr. Topolski assessed that Plaintiff had failed the rotator cuff repair and would need revision. R. 401.

Plaintiff obtained a refill of her Lortab prescription on December 21, 2009, as she was heading out of town for the holidays. R. 394.

On January 20, 2010, following her second rotator cuff repair to her right shoulder on January 12, 2010, Plaintiff was wearing a sling and her pain was well controlled with Dilaudid and Lortab. R. 388, 393.

Plaintiff reported pain of a six out of ten with mobility on February 18, 2010, and was prescribed Vicodin. R. 368.  After progressing well with physical therapy, Plaintiff had a set back and reported increased pain over the previous two weeks. R. 360.  Dr. Topolski instructed

4

her to go slow with physical therapy. R. 360. On March 1, 2010, Plaintiff requested a letter for her disability, and a referral to pain management. R. 353.

Plaintiff began treatment with Sastry Topalli, M.D., with Atlantic Pain Interventions & Rehabilitation, on April 14, 2010. R. 307-310.  Plaintiff indicated that she had been having pain for the last four years in her cervical area, lumbar area, and both shoulders. R. 307.  She described the severity of the pain as a four to five on a scale of one to ten, which worsens with bending and lifting, and improves with narcotics and rest. R. 307. Plaintiff reported difficulty bending, combing hair, performing house and yard work, lifting while performing job, twisting, and writing. R. 307.  Examination revealed Plaintiff had full range of motion in her neck, a decreased range of motion in both shoulders with pain, a decreased cervical range of motion with pain, and a normal lumbar range of motion with some pain. R. 308. She had positive cervical trigger points, but no shoulder, thoracic or lumbar trigger points. R. 308. Plaintiff's muscle strength was normal, and five out of five for all groups tested. R. 309. Dr. Topalli diagnosed cervical radiculopathy and spondylosis without myelopathy, lumbar radiculopathy and spondylosis without myelopathy, and myofacial pain syndrome. R. 309. Dr. Topalli ordered an MRI, and prescribed Tramadol, Vicodin, Flexeril and Neurontin. R. 309.

On April 22, 2010, Plaintiff reported to Dr. Topolski that she continued to have shoulder pain, especially at night, and was taking eight Vicodin each day. R. 344.  Dr. Topolski implemented a weaning program. R. 344.

On April 28, 2010, Plaintiff reported neck pain with a severity of eight out of ten. R. 303. Dr. Topalli's examination revealed Plaintiff had a full range of motion of the neck. R. 304.  Her examination and diagnosis was unchanged from the earlier visit. R. 304-305. Plaintiff received trigger point injections, which caused an allergic reaction. R. 299, 305.  Plaintiff was sent to the

emergency room, where she was evaluated with an EKG, basic lab work, and a CT of the head. R. 306.  She was discharged home in stable condition. R. 306.

On June 4, 2010, Carolina Longa, M.D., a state agency physician, reviewed Plaintiff's record, and concluded Plaintiff retained the ability to perform a limited range of light work. R. 97-102.  She found Plaintiff capable of lifting and carrying twenty pounds occasionally and ten pounds frequently; standing or walking up to six hours in an eight-hour day; and, sitting up to six hours in an eight-hour day. R. 97-99.  She further found Plaintiff should avoid climbing ladders, ropes, or scaffolds, and avoid repetitive lifting overhead. R. 99.

Plaintiff reported to Dr. Topalli that her pain was eight out of ten on June 7, 2010, and July 7, 2010. R. 299.  Dr. Topalli's examination and diagnosis remained the same as in April, and Dr. Topalli ordered a TENS unit. R. 301.

Plaintiff returned to Dr. Topolski on July 20, 2010, having "failed pain management." R. 339.  Dr. Topolski ordered an MRI and noted a physiatrist may be best suited to treat her shoulder. R. 339.  An MRI of Plaintiff's spine showed a mild intramural cyst, but was otherwise "normal with the exception of loss of lordosis overall." R. 335.  Dr. Topolski diagnosed cervical spine degenerative disease, and referred Plaintiff to physical therapy and massage therapy for her neck. R. 335.

On August 6, 2010, Plaintiff reported that one of her medications, Savella, was making her depressed. R. 291.  She was tolerating Vicodin and Tramadol well, and was using the TENS unit. R. 291. The treatment notes from September 7 and September 29, 2010, mirrored those of August 6, 2010. R. 283-90.

On October 25, 2010, Plaintiff indicated weather changes were making her pain worse, and reported her pain was a six out of ten in severity. R. 279. She also reported her right wrist

carpal tunnel syndrome was getting worse, and Dr. Topalli prescribed wrist splints to be worn at night. R. 280-81.

In November 2010, Plaintiff had a right carpal tunnel release, and was doing well two weeks later when she had sutures removed. R. 327. Plaintiff reported decreased numbness and tingling, but that her symptoms were not fully relieved. R. 327.

On December 16, 2010, Plaintiff asked that her Vicodin be switched for a longer acting opioid. R. 635. She tolerated Oxycontin very well, but felt that if she got a slightly increased dose, she would be pain free. R. 635.  Dr. Topalli prescribed Oxycontin controlled release tablets, and night wrist splints. R. 638.

Ralph Hellams, M.D., a state agency physician, reviewed Plaintiff's medical record on December 17, 2010, concurred with the findings of Dr. Longa, and concluded Plaintiff retained the ability to perform a limited range of light work. R. 104-113.

Plaintiff reported on January 14, February 10, and March 10, 2011, that she was tolerating Oxycontin very well with no adverse side effects, and that her back pain was a two to four out of ten. R. 623, 627,[2] 631.  On March 10, 2011, Plaintiff explained she was attending water therapy for her neck, as her neck pain was worse at a seven out of ten. R. 623.

On March 29, 2011, Plaintiff reported that physical therapy for her neck had made her pain worse. R. 322. Dr. Topolski noted Plaintiff "cannot do any other assertive measures," "is unable to undergo any injection therapy," has not been helped by physical therapy, and "is on constant pain management." R. 322.  He concluded that if Plaintiff's symptoms worsen, "she will need an urgent/emergent consultation with a neurosurgeon." R. 322.  Dr. Topolski released Plaintiff without limitations, with directions to follow-up as needed. R. 322.

---

[2] On February 10, 2011, Plaintiff reported knee pain of seven out of ten following a fall over a piece of metal. R. 627.

Over the next five visits to Dr. Topalli, Plaintiff's neck pain progressively reduced, down to a two out of ten on August 4, 2011. R. 605, 607, 611, 615, 619.  Plaintiff's neck pain was a six out of ten on August 26, 2011, and a four out of ten on September 30, 2011. R. 599, 602. However, Dr. Topalli's notes indicate Plaintiff's urine drug screens showed only Tramadol on August 26, 2011, and September 30, 2011, whereas the August 4, 2011 notes indicate Plaintiff was in compliance with her medications. R. 599, 602, 605.  Further, Plaintiff reported on April 8, May 6, June 6, July 5, August 4, August 26, and September 30, 2011, that she was tolerating Oxycontin very well with no adverse side effects, with her back pain controlled at a two to four out of ten. R. 599, 602, 605, 607, 611, 615, 619.

Plaintiff was examined by John W. Aldridge, M.D. of Hampton Roads Orthopaedics and Sports Medicine on October 21, 2011. R. 646.  Examination revealed positive Hawkins and Neers tests and radiculopathy. R. 646. Dr. Aldridge diagnosed AC joint arthritis and bilateral shoulder impingement. R. 646.  Dr. Aldridge prescribed Ibuprofen, Motrin, Percocet, Vicodin, and Oxycontin, and ordered an MRI of Plaintiff's shoulders. R. 646.

On November 8, 2011, Dr. Topolski completed a form entitled Medical Opinion Re: Ability to Do Work-Related Activities (Physical). R. 595-96.  He found Plaintiff was able to lift and carry less than ten pounds on an occasional basis; stand and walk less than two hours in an eight-hour day; and, sit less than two hours in an eight-hour day. R. 595.  Further, he found Plaintiff would need to take unscheduled breaks during the work shift, would need to lie down at unpredictable intervals during a work shift, and would be absent from work more than three times a month. R. 595.  Plaintiff could never stoop, crouch, or climb ladders. R. 596.  The medical findings listed in support of these limitations were severe bilateral shoulder rotator cuff arthrosis and fibromyalgia. R. 595.

### B.       Third-Party Statements – November 2011

On November 2, 2011, Plaintiff's father, Mr. Thomas Taliaferro, wrote a statement regarding Plaintiff's condition. R. 225.  Mr. Taliaferro described how Plaintiff went from being an active child and adult, to no longer being able to perform her chosen profession as a nurse. R. 225.  He wrote that she was in constant pain and on strong pain medication. R 225.  He stated Plaintiff could shop, but could not lift grocery bags.  Although she could play with her niece, Plaintiff could not lift or carry her. R. 225.  Plaintiff could do light housework, but not the thorough job she once did. R. 225.  If she did more than minimal things, she appeared to be in pain, took pain medication, and would lie down until the pain subsided. R. 225.

Plaintiff's spouse, Mark Gelbrich, made a written statement on November 6, 2011, regarding Plaintiff's condition. R. 223-24.  Mr. Gelbrich wrote that from 2002 through 2004, Plaintiff was very active, and that in addition to working as a nurse, enjoyed riding a motorcycle, swimming, working out on a treadmill, and camping. R. 223.  He stated that after being diagnosed with fibromyalgia in 2004, she became exhausted from pain and disturbed sleep and underwent five unsuccessful rotator cuff surgeries. R. 223.  After the surgeries, she obtained little relief from physical therapy or pain management. R. 223.  He noted Plaintiff "can no longer ride on the motorcycle other than an occasional ride to get lunch close by, and even then it takes a great toll on her."  R. 223.  She struggled to take a shower or make the bed. R. 223.  She often cancelled dinner plans with friends due to pain or exhaustion. R. 223.  Mr. Gelbrich wrote that staying in any position too long led to stiffness, pain, and numbness. R. 223.  Plaintiff was irritable, emotional, forgetful, and lacked concentration; and, Mr. Gelbrich believed this was due to her medications. R. 224.  On a good day, she took one nap, and on a bay day, she could only sleep and rest. R. 224.

### C.     Plaintiff's Hearing Testimony – November 10, 2011

At the time of the ALJ hearing, held November 10, 2011, Plaintiff lived with her husband and adult son, both of whom worked. R. 65-66. Plaintiff testified that in her work as a nurse, she was required to stand for four to eight hours at a time, lift twenty-five to thirty pounds, bend, and stoop. R. 67. After three surgeries on her left shoulder, her right shoulder began to hurt, and her fibromyalgia worsened. R. 69. She had to start taking narcotics at work and go to bed after work every day. R. 69. After she quit working, Plaintiff had endoscopic surgery on her right shoulder. R. 69-70. When the pain continued to worsen, a second shoulder surgery was performed on her right shoulder. R. 71. This also did not relieve the pain. R. 71. Following the second surgery, Plaintiff experienced throbbing pain in her right shoulder, pain radiating from her neck down to her hands, and numbness in her fingers. R. 71.  The pain worsened with physical therapy. R. 71-72. Plaintiff was examined by a new doctor shortly before the administrative hearing, who administered cortisone injections. R. 80-81. If the injections did not work, he discussed the possibility of further surgery for a shoulder replacement or possibly to clean up the scar tissue. R. 80-81.

Plaintiff testified that her fibromyalgia affects every joint in her body, giving her leg cramps that bring her to tears, as well as pain in her shoulders, neck, and elbows. R. 74. Plaintiff also had carpal tunnel surgery, which helped, but did not completely eradicate, the numbness in her fingers. R. 75.

Plaintiff testified that almost everything she does causes pain in her neck, shoulders, hips and legs. R. 63.  She cannot open jars and uses both hands to lift anything over five or ten pounds, because her fingers go numb. R. 64. She can write for five minutes before her hand cramps, and she gets pain through her wrist and arm. R. 64.  She can read. R. 64.  Plaintiff drives

up to thirty or forty miles at a time; however, after fifteen minutes, she has pain shooting down her neck into her arms and hands, her hips start hurting, and her feet go numb. R. 64-65. After ten to twelve stairs, she has shortness of breath and pain in her hips, knees, and feet. R. 66. She can walk approximately thirty feet, but walking causes her ankles to hurt and her feet to go numb and tingle. R. 82. Sitting causes her hips to hurt, and she needs to constantly reposition herself in her recliner. R. 83. She is unable to lift up high, has limited range of motion in her neck, and problems with stiffness. R. 83-84. When she grocery shops, she has the groceries loaded into her car, and waits for her husband to unload the non-perishable goods. R. 81-82.

Plaintiff testified she had strange reactions to the fibromyalgia medicine, such as being homicidal or dizzy. R. 73. She had an allergic reaction to trigger point injections, requiring transport to an emergency room. R. 73. At the time of the hearing, Plaintiff was taking Oxycontin every twelve hours, Ultram every eight hours, and sometimes Flexeril twice a day. R. 73. Plaintiff testified her pain medication reduces her pain from a nine to ten on a ten-point scale to a three to four, with the pain relief lasting about eight hours. R. 76. She further testified the medications result in drowsiness and loss of concentration. R. 77.

Plaintiff can vacuum, dust, and load the dishwasher; but, she has to take many breaks. R. 78. She cooks once or twice a week. R. 85. Plaintiff testified that she has very bad days two or three days a week, where she stays in bed most of the day or lays in a recliner and watches television. R. 79.

Vocational Expert ("VE"), Barbara Byers, testified at the hearing. R. 87-91. Ms. Byers classified Plaintiff's past relevant work, as a nurse, as skilled and in the light physical demand level. R. 87. The ALJ asked Ms. Byers to consider potential jobs for a hypothetical individual with Plaintiff's age, education, and work background; who could do the following: lift, carry,

push, and pull up to ten pounds occasionally from waist to chest level; stand and walk four hours within an eight-hour workday; sit four hours within an eight-hour workday with the option to sit or stand; and, perform simple, routine, low-stress tasks. R. 88.  The hypothetical person needed to avoid the following: overhead work activity, including reaching; crawling and climbing ladders, ropes and scaffolds; repetitive and frequent twisting and turning; and, constant, fine, and gross manipulation and reaching. R. 88. Ms. Byers testified that such an individual could not perform Plaintiff's past work, but could perform work as an apparel stock checker, or a mail clerk. R. 88. Ms. Byers further testified that she was familiar with these jobs, and the fact that they allow the worker to change position. R. 88.

Plaintiff's attorney asked whether these jobs would still exist if the individual could stand and walk less than two hours in an eight-hour day, sit less than two hours in an eight-hour day, and would need to take breaks other than the breaks normally allowed. R. 89.  Ms. Byers responded that such limitations would eliminate the jobs, as would missing work more than three times a month, or an inability to complete work tasks 20% of the time due to medication side-effects. R. 89.

### D. ALJ's Decision – January 19, 2012

The ALJ found Plaintiff met the insured status requirements of the Act through December 31, 2013. R. 23.  At step one of the sequential analysis, the ALJ found Plaintiff did not engage in substantial gainful activity during the period from her alleged onset of disability on August 11, 2009, through the date of the decision. R. 23.  The ALJ found at step two, that Plaintiff's back and shoulder disorders, carpal tunnel syndrome, and myofascial pain syndrome, constitute severe impairments. R. 23. Third, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1. R. 24. The ALJ determined Plaintiff had the RFC to perform less than a full range of light work as defined in 20 C.FR. § 404.1567(b), but at step four, determined she could not perform her past relevant work. R. 24-27. Fifth, considering claimant's age, education, work experience, and RFC, the ALJ concluded a significant number of jobs existed in the national economy that Plaintiff could perform. R. 28. These findings led the ALJ to conclude Plaintiff was not under a disability from the alleged onset date of August 11, 2009, through the date of the ALJ's decision. R. 29.

In her Brief in Support of her Motion for Summary Judgment, Plaintiff alleges the ALJ erred by giving improper weight to the opinion of the treating physician, by failing to indicate how frequently Plaintiff would have to alternate between sitting and standing, and in failing to make proper credibility findings as to Plaintiff's testimony. Pl.'s Mem. 2. This Court finds the ALJ's determination is supported by substantial evidence in the record, and recommends that the decision of the Commissioner be AFFIRMED.

## III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368

F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

To qualify for a period of disability and DIB under section 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the

claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

### A.     Substantial Evidence Supports the ALJ's Decision to Assign Slight Weight to Dr. Topolski's Opinion

Plaintiff asserts the ALJ erred by assigning Dr. Topolski's opinion slight weight, arguing Dr. Topolski's opinion is supported by clinical evidence and is consistent with other evidence in the record. Pl.'s Mem. 22-29. Defendant counters that Dr. Topolski's extreme limitations on Plaintiff's abilities are inconsistent with his own treatment notes, as well as others showing

improvement in Plaintiff's symptoms. Def.'s Mem. 11-14.

A treating source's opinion on issues regarding the nature and severity of an impairment is to be given controlling weight if it is well supported by medically-accepted clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1526(b), 404.1527(d), 416.927(d)(2). However, it follows that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Dr. Topolski's opinion on November 8, 2011, was that due to severe bilateral shoulder rotator cuff arthrosis and fibromyalgia, Plaintiff could lift and carry less than ten pounds on an occasional basis; stand and walk less than two hours in an eight-hour day; and, sit less than two hours in an eight-hour day. R. 595.  Further, he found Plaintiff would need to take unscheduled breaks during the work shift, would need to lie down at unpredictable intervals during a work shift, and would be absent from work more than three times a month. R. 595.

The ALJ assigned Dr. Topolski's opinion slight weight, because it was not consistent with Dr. Topolksi's overall treatment of Plaintiff, or progress notes reflecting improvement in Plaintiff's symptoms.  R. 27. The ALJ discussed Dr. Topolski's notes from Plaintiff's last appointment in 2011, which indicated Plaintiff reported no benefit from physical therapy for her neck pain.  R. 26.  The ALJ summarized results of Dr. Topolski's physical examination revealing Plaintiff was well nourished, well developed, in no acute distress, alert and oriented times three, and sitting comfortably in the exam room; and, indicating there was no change in the examination of her neck and right upper extremity compared to previous exams.  R. 26.  Lastly, the ALJ remarked that Dr. Topolski released Plaintiff without limitations, and with no follow-up scheduled. R. 27.

The ALJ discussed Plaintiff's shoulder surgeries, post-operative diagnostic studies, a cervical MRI, and treatment notes from Dr. Topalli including medications prescribed. R. 26. Next, the ALJ summarized Plaintiff's testimony and discussed the two third-party statements. R. 26-27.[3] Lastly, finding that the opinions were based on an incomplete record, the ALJ assigned slight weight to the opinions of the state agency physicians, and assessed Plaintiff with greater limitations. R. 27.

A review of the record reveals substantial evidence to support the ALJ's decision to assign Dr. Topolski's opinion slight weight. Following Plaintiff's last shoulder surgery, she was progressing well with physical therapy until February 2010, when she suffered a setback and reported increased pain. R. 360. Dr. Topolski referred Plaintiff to pain management, and Plaintiff began treatment with Dr. Topalli in April 2010. R. 307-310.

Dr. Topalli's examination revealed positive cervical trigger points, but no other positive trigger points. R. 308. Plaintiff indicated her carpal tunnel symptoms improved following surgery. R. 327. According to Dr. Topalli's treatment notes, Plaintiff indicated in December 2010 that if she received a slightly increased dose of Oxycontin, she would be pain free. R. 635. Further, Plaintiff indicated on January 14, February 10, March 10, April 8, May 6, June 6, July 5, August 4, August 26, and September 30, 2011, that she was tolerating Oxycontin well with no adverse side effects, and Plaintiff reported pain at a two to four out of ten. R. 599, 602, 605, 607, 611, 615, 619, 623, 627, 631.

The Court notes that in the form containing his medical opinion regarding Plaintiff's ability to work, Dr. Topolski lists fibromyalgia as one of the medical findings supporting the limitations he placed on Plaintiff. R. 595. In addition, the state agency physicians listed

---

[3] The ALJ refers to third-party statements by Mark Gelbrich and Plaintiff's mother. R. 27. However, though the signature on the November 2, 20011 statement, is illegible, the cover sheet indicates it is from Plaintiff's father, Thomas Taliaferro. R. 222.

fibromyalgia, secondary to "dysfunction – major joints," as a medically determinable impairment. R. 97, 108. However, neither Dr. Topolski nor Dr. Topalli mentions fibromyalgia in their treatment notes.  In the motion for summary judgment, Plaintiff refers to five pages of handwritten notes dated December 19, 2008 through July 10, 2009. R. 248-52.  On one page of the notes dated December 19, 2008, the words "plastic surgeon fibromyalgia" appear; however, the notes are not signed and there is no indication of who was treating Plaintiff at this time. R. 252.  The dates do not coincide with Plaintiff's treatment by Dr. Topolski or Dr. Topalli.  What is clear from the record is that Dr. Topalli repeatedly diagnosed Plaintiff with, and treated Plaintiff for, myofascial pain syndrome. R. 277, 281, 285, 289, 293, 297, 301, 305, 309.  The ALJ found that "[a]lthough DDS, the state agency found that fibromyalgia was a severe impairment, the evidence of record supports a finding of myofascial pain syndrome instead." R. 23. Fibromyalgia and myofascial pain syndrome can cause similar symptoms. SSR 12-2p, n.7, 2012 WL 3104869 (2012).[4]  Accordingly, substantial evidence in the record supports the ALJ's finding that Plaintiff's impairments include myofascial pain syndrome as opposed to fibromyalgia.

Furthermore, the ALJ accounted for Plaintiff's symptoms in his RFC, which allowed Plaintiff to: change positions; avoid crawling, climbing, repetitive twisting and turning the neck, constant fine/gross manipulation or reaching; and limited Plaintiff to simple, routine low stress tasks. R. 24.  The state agency doctors found Plaintiff capable of performing a limited range of light work, lifting and carrying twenty pounds occasionally and ten pounds frequently, standing or walking up to six hours in an eight-hour day, and sitting up to six hours in an eight-hour day. R. 97-102.  However, as these determinations were reached in June and December 2010, the ALJ

---

[4] According to an article from the Mayo Clinic, myofascial pain syndrome may develop into fibromyalgia in some people. Mayo Clinic, *Myofascial Pain Syndrome*, (Jan. 5, 2012), http://www.mayoclinic.org/ diseases-conditions/myofascial-pain-syndrome/basics/complications/con-20033195.

found the opinions were based on an incomplete record, assigned the opinions slight weight, and assessed Plaintiff with greater limitations. R. 27.

The ALJ explained his good reasons for not giving Dr. Topolski's opinion controlling weight. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or on the Commissioner's designate, the ALJ)." *Craig*, 76 F.3d at 589. Substantial evidence in the record supports the ALJ's decision that Dr. Topolski's opinion was entitled to slight weight, and the Court does not find reversible error.

**B.     The ALJ Appropriately Limited Plaintiff to a Range of Light Work with the Option to Sit or Stand**

Plaintiff next contends the ALJ's RFC finding should be vacated, because, in the hypothetical to the Vocational Expert, the ALJ did not include the frequency with which Plaintiff would need to alternate between sitting and standing. Pl.'s Mem. 29. The ALJ's RFC, and the hypothetical posed to the Vocational Expert, provided Plaintiff "can sit four hours within an eight-hour workday with the option to sit or stand." R. 24, 87. The Court finds the ALJ did not commit reversible error by failing to delineate the frequency with which Plaintiff would need to alternate between sitting and standing.

Plaintiff argues the ALJ's RFC and hypothetical fails to comply with Social Security Ruling 96-9p, which states,

> [a]n individual may need to alternate the required sitting of *sedentary work* by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be

> especially useful in these situations to consult a vocational resource
> in order to determine whether the individual is able to make an
> adjustment to other work.

SSR 96–9p, 1996 WL 374185 at *7 (1996) (emphasis added).  Due to the fact that this SSR

specifically references sedentary work, several cases have found the regulation does not apply

where an ALJ has required a sit-stand option for light work. *See Vallejo v. Astrue*, 3:10cv445,

2011 WL 4595259 at *9-11 (W.D.N.C. Aug. 4, 2011) *report and recommendation adopted,*

3:10cv445, 2011 WL 4597348 (W.D.N.C. Sept. 30, 2011) (holding SSR 96-9p does not apply

where the ALJ found the claimant capable of a full range of light work); *Smith v. Astrue*,

5:09cv158, 2010 WL 3749209 at *19 (N.D. Fla. Aug. 25, 2010) (acknowledging that SSR 96–9p

does not apply to light work and noting that an ALJ's failure to state a frequency in such a case is

not a basis for relief); *Taylor v. Astrue*, 3:08cv346, 2009 WL 3232135 at *8 (M.D. Fla. Sept. 29,

2009) (holding that "it was not necessary for the ALJ to incorporate additional 'details' about

Plaintiff's need for a sit/stand option" when Plaintiff's RFC was for light work); *Cf Vail v.

Barnhart*, 84 Fed. Appx. 1, 2003 WL 22810457 at *6 (10th Cir. 2003) (reversing for several

errors, including failure to comply with SSR 96-9p in a case where the claimant was limited to a

range of light work).  The Court finds SSR96-9p does not apply in this case where the ALJ found

Plaintiff capable of a range of light work.

Moreover, even if SSR 98-9p were to apply to light work scenarios, the more persuasive

cases on this issue have determined that the reasonable construction of hypotheticals, similar to

the one used in this case, is that the claimant can sit and stand "at-will;" and, these hypotheticals

have been found sufficient to comply with the regulation. *See Williams v. Barnhart,* 140 Fed.

App'x 932, 936–37 (11th Cir.2005) (holding "although the ALJ failed to specify the frequency

that [the claimant] needed to change his sit/stand option, the reasonable implication of the ALJ's

description was that the sit/stand option was at [the claimant's] own volition"); *Herrien v. Astrue*, 2:11cv560, 2013 WL 1121361 (E.D. Va. Feb. 21, 2013) (collecting cases).  *See also Thompson v. Astrue,* 2011 WL 3489671 at *2; 442 Fed. App'x 804, 807 (4th Cir. 2011) (holding a sit-stand option required no greater specificity when the analysis terminated at step four, finding the claimant able to perform past relevant work).

Accordingly, the ALJ did not commit reversible error when his RFC, and resulting hypothetical to the Vocational Expert, reflected Plaintiff's ability to "sit four hours within an eight-hour workday with the option to sit or stand."

### C.      Substantial Evidence Supports the ALJ's Credibility Determination

Next, Plaintiff asserts the ALJ erred in finding Plaintiff was not a credible witness. Pl.'s Mem. 30-33.  The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996).  First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms.  *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record.  *Id.*  If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work.  *Id.* at 595.  The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements.  *Id.* at 595-96.

This Court must give great deference to the ALJ's credibility determinations. *See e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-91 (1951).  The Fourth Circuit has held,

"[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'"   *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted).   Therefore, this Court must accept the ALJ's assessment of Plaintiff's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. *Id.*

Furthermore, as the Fourth Circuit recognizes, the Plaintiff's subjective statements about her pain are not, alone, conclusive evidence that plaintiff is disabled. 20 C.F.R. § 404.1529(a). Rather, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 591-92 (4th Cir. 1996). Finally, Social Security Ruling 96-7p states that the evaluation of a Plaintiff's subjective complaints must be based on consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings; (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; and (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible" to the extent they were inconsistent with the ALJ's RFC assessment. R. 31.[5]   The ALJ also considered the third-party

---

[5] The ALJ's finding that that Plaintiff's statements were "not credible to the extent they [were] inconsistent with" the ALJ's RFC assessment, appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004); *Racey v. Astrue*, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013).   In and of itself, this language is problematic because it places the cart before the horse in terms of making an RFC determination with all available evidence, including the credibility determination. *See* 20 C.F.R. § 404.1529(c)(4); *see also Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a

statements, and assigned the statements slight evidentiary weight as the statements report limitations greater than evidenced by the objective medical evidence. R. 27.

In reaching the determination regarding Plaintiff's credibility, the ALJ first addressed how the objective medical evidence did not support Plaintiff's subjective complaints.  The ALJ discussed Dr. Topolski's treatment records, Plaintiff's shoulder surgeries and carpal tunnel release, Plaintiff's cervical MRI, Dr. Topalli's examination notes, and Plaintiff's medications. R. 26. *See* 20 C.F.R. §§404.1529(c)(3), 416.929(c)(3) (listing treatment received and daily activities as relevant factors the ALJ will consider when evaluating symptoms such as pain).  He noted that Dr. Topolski released Plaintiff without limitations, Dr. Topalli found positive cervical trigger points but no other positive trigger points, Plaintiff's carpal tunnel symptoms were improving with the use of night wrist splints, and Plaintiff tolerated Oxycontin well and denied any adverse side effects. R. 26.  Concluding that Plaintiff's subjective complaints were contradicted by her daily activities, the ALJ noted Plaintiff could read, add, subtract, grocery shop, visit family, and drive more than short distances. R. 26.

Substantial evidence supports the ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible, and the Court finds no "exceptional circumstances" exist that warrant reversing the ALJ's credibility determination. *See Edelco, Inc.*, 132 F.3d at 1011.

## V.  <u>RECOMMENDATION</u>

Based on the foregoing analysis, this Court recommends that Plaintiff's Motion for

---

claimant's ability to work will often . . . depend[] heavily on the credibility of her statements.").  However, in this case, "it is clear in the pages that follow the boilerplate language[], the [ALJ] considered the evidence of the record and provided sufficient support for both his RFC finding and his determination of plaintiff's credibility regarding the limiting effects of her condition."*Racey*, 2013 WL 589223, at *6. Therefore, no error of law occurred because the ALJ's provided significant discussion of the particular credibility issues.

Summary Judgment (ECF No. 11) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

/s/_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
March 31, 2014